UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LEANDER CARTER,
       Plaintiff,

       v.                                    09-02247

Dr. Bashir Ameji, et al.,
       Defendants.

MEMORANDUM OPINION AND ORDER

Before the court are Wexford Health Sources, Inc., Dr. Bashir Ameji and Terry Fueyo's summary judgment motion [84], Plaintiff's response [90] and Defendants' reply [99].

Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000). "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(c). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the

nonmovant]." Fed. R. Civ. P. 56(e).  Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor.  *Basith v. Cook County*, 241  F.3d 919, 926 (7th Cir. 2001).  Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial.  *Filipovic v. K&R Express Systems, Inc*., 176 F.3d 390, 390 (7th Cir. 1999).  Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4) (emphasis added).  Personal knowledge may include inferences and opinions drawn from those facts.  *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).  "But the inferences and opinions must be grounded in observation or other first-hand personal experience.  They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience."  *Visser*, 924 F.2d at 659.  It is also well settled that "conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment.  Keri v. Barod of Trustees of Purdue University, 458 F.3d 620, 628 (7th Cir.2006)(*citing Haywood v. N. Am. Van Lines, Inc.,* 121 F.3d 1066, 1071 (7th Cir.1997).

Background

Plaintiff alleges in his Amended Complaint that he suffered constitutional violations while incarcerated at the Danville Correctional Center.  Plaintiff alleges that he suffered a state law medical battery at the hands of Dr. Ameji.  Plaintiff's allegations center around the treatment of his inguinal hernia while at the Danville Correctional Center and subsequently at the Shawnee Correctional Center.  Plaintiff was treated for his inguinal hernia  conservatively by Dr. Ameji at the Danville Correctional Center.  Terry Fueyo was the Director of Nursing at the Danville Correctional Center.  Wexford Health Sources, Inc. was the employer of Dr. Ameji and Terry Fueyo.

Undisputed Material Facts[1]

1.  Plaintiff Leander Carter is currently serving a 25 year sentence for aggravated kidnapping and ransom as well as a five year sentence for aggravated unlawful restraint.  (Plaintiff's deposition, p. 7.)
2.  Plaintiff was incarcerated at the Danville Correctional Center from June 11, 2007 until December of 2008. (Plaintiff's deposition, pp. 11-12.)

---

[1]Exhibits can be found attached to Defendants' summary judgment motion [84], unless otherwise noted.

2

3.      Plaintiff was first diagnosed with his inguinal hernia on February 24, 2003.  (Plaintiff's deposition, p. 11.)

4.      Plaintiff did not suffer any problems with his hernia from 2003 up until 2007.  (Plaintiff's deposition, p. 12.)

5.      Plaintiff admits that his hernia has never become enstrangulated.  (Plaintiff's deposition, p. 12.)

6.      Plaintiff admits that he has never been unable to reduce his hernia.  (Plaintiff's deposition, p. 12.)

7.      When Plaintiff initially suffered the hernia, it was about the size of a third of a golf ball.  (Plaintiff's deposition, p. 13.)

8.      At the time of his deposition on November 17, 2010, the Plaintiff's hernia was about the size of half of a golf ball.  (Plaintiff's deposition, p. 13.)

9.      Plaintiff was able to bench press 300 pounds while he was incarcerated at the Danville Correctional Center.  (Plaintiff's deposition, p. 30.)

10.     Plaintiff was able to participate in weight lifting four times a week while at the Danville Correctional Center.  (Plaintiff's deposition, pp. 30-31.)

11.     Plaintiff was able to participate in weight lifting without a hernia belt.  (Plaintiff's deposition, p. 31.)

12.     On September 18, 2008, Plaintiff took down his pants willingly in order for Dr. Ameji to examine his hernia.  (Plaintiff's deposition, p. 41.)

13.     Plaintiff admits that his revocation of consent and Dr. Ameji's termination of his examination were nearly simultaneous.  (Plaintiff's deposition, p. 43.)

14.     After the revocation, Dr. Ameji never touched the Plaintiff again.  (Plaintiff's deposition, p. 43.)

15.     According to the medical records, Plaintiff was transferred to the Danville Correctional Center on June 14, 2007.  (Ameji Affidavit; and Exhibit 1, p. 44.)

16.     During his reception screening, Plaintiff made no complaints of any medical conditions whatsoever.  (Ameji Affidavit; and Exhibit 1, p. 44.)

17.     According to the medical records, the first time the Plaintiff made complaints regarding his hernia was November 27, 2007.  At that time, the Plaintiff informed LPN Barb Browntree that he had a hernia that was causing him problems and kept popping out when he tried to climb up into his bed.  As a result, Ms. Browntree referred the Plaintiff to see the medical doctor or the physician's assistant.  (Ameji Affidavit; and Exhibit 1, p. 45.)

18.     The next day, November 28, 2007, Dr. Ameji saw the Plaintiff in regards to his complaints. Dr. Ameji's note from that date states as follows:

Subjective: 47 year old black male. 5'8" tall. Approximately 185 lbs. His voice is thick. Blood pressure from November 27, 2007 was 150/100. Left inguinal hernia. 2" in diameter. Not descending into testes. No sports. No gym.

Plan: No exertional activity.

(1) HCT two times a day
(2) Tylenol for six months. Hernia belt and truss. Wear during the day and

3

remove at bedtime.
(Ameji Affidavit; and Exhibit 1, p. 46.)

19.   On this date, Dr. Ameji performed an examination of Plaintiff's small inguinal hernia. Dr. Ameji noted the size of the hernia was approximately 2 inches in diameter. It was not descending. He noted the hernia was reducible and was not in danger of becoming enstrangulated. As such, Dr. Ameji ordered the Plaintiff to receive a hernia belt and a truss. (Ameji Affidavit.)

20.   Plaintiff made no complaints to the Health Care Unit regarding his hernia at any time in December 2007, January 2008, February 2008, March 2008, April 2008 or May 2008.

21.   The next time the Plaintiff was seen in the Health Care Unit was May 28, 2008 for his annual TB screen. (Ameji Affidavit; and Exhibit 1, p. 48.)

22.   On May 31, 2008, Plaintiff's hypertension medication had expired and he was seen in the Health Care Unit by LPN Christina Miles. The Plaintiff refused an EKG recommended by Dr. Ameji to monitor his condition. Further, Plaintiff's medications for his hypertension were renewed by Dr. Ameji. (Ameji Affidavit; and Exhibit 1, p. 49.)

23.   The next visit Plaintiff had with the Health Care Unit was June 9, 2008. On that date, he was seen by an RN for review of his left testicle and left inguinal hernia. On that date, Dr. Ameji performed another examination of the Plaintiff. His note from that date states as follows:

Subjective: 47-year-old black male. 5'8" tall. Weight 185 lbs. Complains of left-sided hernia.

Objective: A small hernia. Hernia belt for the left side.

Plan: Low bunk pass for 6 months and hernia belt. No sports. No gym. May walk.
(Ameji Affidavit; and Exhibit 1, p. 50.)

24.   Dr. Ameji reviewed the Plaintiff's case on August 26, 2008. On that date, Dr. Ameji noted the Department of Corrections' policies is that unless a hernia is distended into the testes, it is to be treated conservatively. Plaintiff's medical records indicate that he was to avoid exertional activity. No sports, etc. He also instructed the Plaintiff to wear his inguinal belt during the day while he is awake and to remove it at bedtime. Dr. Ameji noted that he would speak to Plaintiff during collegial review on the next day, August 27, 2008. (Ameji Affidavit; and Exhibit 1, p. 51.)

25.   On this date, Dr. Ameji was informing the Plaintiff that he would not be receiving surgical intervention for his hernia due to the fact that it could be appropriately treated conservatively. In short, it was Dr. Ameji's medical opinion that the Plaintiff's medical condition did not require surgerical intervention. (Ameji Affidavit.)

26.   Plaintiff was next seen September 10, 2008, by an LPN and a Physician's Assistant. Plaintiff was complaining that he had an eye infection. Plaintiff did not make any complaints in regards to his inguinal hernia. (Ameji Affidavit; and Exhibit 1, p. 52.)

27.   Dr. Ameji saw the Plaintiff on September 11, 2008, in regards to his eye infection. Plaintiff made no complaints in regards to his inguinal hernia. (Ameji Affidavit; and Exhibit 1, pp. 53-58.)

28.   In fact, Plaintiff was admitted to the infirmary to monitor his eye infection. Plaintiff remained in the infirmary until September 12, 2008. (Ameji Affidavit; and Exhibit 1, p. 61.)

4

29.     The next time Dr. Ameji saw the Plaintiff was September 18, 2008. His note from that date states as follows:

>    Subjective:  48-year-old black male. 5'8".
>    Objective:  Has a small inguinal hernia on the left side.  The hernia is not descending into scrotum.  Small hernia 2" x 1" large.  There is no edema around it.  No sign of strangulation.  No sign of any pain and discomfort like grimace, etc.

Dr. Ameji noted during that Terry Fueyo, Director of Nursing, was present.  Tina Miles was present.  Linda present during the examination.  (Ameji Affidavit; and Exhibit 1, pp. 62 and 63.)

30.     That was the last visit Dr. Ameji had with the Plaintiff.  According to the medical records, the Plaintiff was transferred to the Shawnee Correctional Center on December 1, 2008. Dr. Ameji did not treat the Plaintiff at any time thereafter.  (Ameji Affidavit; and Exhibit 1, p. 66.)

31.     During the time that Dr. Ameji treated the Plaintiff at the Danville Correctional Center, Plaintiff's hernia did not require surgery, in Dr. Ameji's medical opinion.  (Ameji Affidavit.)

32.     There are risks involved in surgical intervention for a hernia of the type of the Plaintiff. Specifically, those risks include surgical complications, anesthesia complications, as well as risks of infection.  Included in the surgical complications are recurrence of the hernia, incontinence, erectile dysfunction, and possible loss of blood supply to the testes resulting in the potential loss of the testicles.  (Ameji Affidavit.)

33.     In Dr. Ameji's medical opinion, Plaintiff's hernia was not a candidate for surgery because the risks of surgery outweighed the potential benefits.  (Ameji Affidavit.)

35.     As to Plaintiff's allegation that Dr. Ameji performed a medical battery on him on September 18, 2008, Dr. Ameji denies that he ever touched the Plaintiff without his consent.  (Ameji Affidavit.)

36.     On that date, Dr. Ameji examined Plaintiff's inguinal hernia in the presence of three nurses.  (Ameji Affidavit.)

37.     Plaintiff gave his consent to the examination, and Dr. Ameji touched the Plaintiff only for the purposes of examining the condition of his inguinal hernia.  (Ameji Affidavit.)

38.     At no time did Dr. Ameji touch the Plaintiff without his consent.  (Ameji Affidavit.)

39.     It appears from the medical records the Plaintiff arrived at the Danville Correctional Center on June 14, 2007. On that date, Terry Fueyo performed the Reception Screening of the Plaintiff.  Plaintiff made no complaints to Terry Fueyo. Fueyo took the Plaintiff's temperature, pulse, rate and blood pressure.  (Fueyo Affidavit; and Exhibit 1, p. 44.)

40.     Terry Fueyo did not have any involvement in the Plaintiff's care or treatment again until September 18, 2008. On that date, Fueyo was present while Dr. Ameji performed his evaluation of the Plaintiff's left inguinal hernia.  (Fueyo Affidavit, and Exhibit 1, pp. 62 and 63.)

41.     Terry Fueyo has reviewed Dr. Ameji's note from that date. Dr. Ameji's note is accurate. (Fueyo Affidavit.)

42.     Plaintiff was called to the Health Care Unit on that date at Terry Fueyo's request in order

to respond to a grievance the Plaintiff had filed.  When Plaintiff arrived at the Health Care Unit, he was placed in the examination room and the curtain was pulled. Dr. Ameji asked the Plaintiff to pull his pants down far enough to assess the hernia.  A small bulge was visible on the left groin area, and Dr. Ameji gloved up and examined the area. (Fueyo Affidavit.)

43.   Plaintiff appeared to be in a heightened emotional state before the exam began and became very emotional during the actual exam.  (Fueyo Affidavit.)

44.   Dr. Ameji was attempting to explain to Terry Fueyo and the Plaintiff his medical reasoning for his prescribed treatment of the hernia when the Plaintiff stated that the area was painful and pulled away from Dr. Ameji's hand, stating:  "Take it easy, man". (Fueyo Affidavit.)

45.   Dr. Ameji felt the area again, and that concluded the exam.  (Fueyo Affidavit.)

46.   After the exam, Plaintiff made it known that he was refusing a hernia belt and any further treatment at that time.  (Fueyo Affidavit.)

47.   Terry Fueyo instructed the Plaintiff to leave the Health Care Unit at that time and told Plaintiff he would follow up with him.  (Fueyo Affidavit.)

48.   Terry Fueyo did this because it was apparent to Fueyo that the Plaintiff was upset and Fueyo did not want the situation to escalate.  (Fueyo Affidavit.)

49.   Dr. Ameji was at no time unprofessional nor did he touch the Plaintiff's person without the Plaintiff's permission.  (Fueyo Affidavit.)

50.   Plaintiff wanted his hernia surgically repaired and Dr. Ameji did not think that the hernia was a candidate for surgical intervention.  Dr. Ameji presented a treatment plan to the Plaintiff to address the hernia in its current state, but the Plaintiff was not amicable to this treatment and was very vocal against it.  (Fueyo Affidavit.)

51.   Terry Fueyo's only other involvement in this case was his response to the Grievance Officer's request for information to respond to Plaintiff's grievances. (Fueyo Affidavit.)

52.   Terry Fueyo accurately represented the Plaintiff's condition to the Grievance Officer and informed the Grievance Officer of Dr. Ameji's medical decisions regarding Plaintiff's hernia.  (Fueyo Affidavit.)

53.   Terry Fueyo was not involved in Plaintiff's medical treatment or in determining his plan of care.  (Fueyo Affidavit.)

54.   Dr. Ameji claimed that he treated Plaintiff's hernia conservatively because the Illinois Department of Corrections has a policy that does not allow him to treat Plaintiff's hernia any other way unless Plaintiff's hernia has descended into his testicles. (Aff. of Ameji, ¶par. 14).

55.   Wexford Health Sources physicians, such as Dr. Ameji, do not monitor inmates conditions if they have sustained an inguinal hernia.  The primary responsibility for monitoring inguinal hernias lies within the inmate experiencing the problem. Nurses and doctors are available when an inmate submits a sick-call request.  Thereafter, Plaintiff is

supposed to be provided with adequate treatment at that point in time.  (Plaintiff's Exh. - Ameji's Ans. to First Set of Interr., ¶Int. 3.)

The court notes that the plaintiff lists additional material facts, but his facts (numbers 1

6

and 2) are either not supported by the documents to which he points or the documents he points to do not exist in the record. Therefore, these facts will not be considered.

Disputed Immaterial Fact[2]

1.    Dr. Ameji instructed the Plaintiff to avoid exertional activity. (Ameji Affidavit & Carter Affidavit, ¶ 17).
2.    On August 26, 2008, Dr. Ameji informed the Plaintiff that Dr. Ameji would be monitoring the Plaintiff's situation and instructed him to continue to wear his inguinal hernia belt during the day while he was awake. Further, he was to avoid exertional activities such as sports.
3.    While Dr. Ameji was treating the Plaintiff, he reported to Dr. Ameji that his hernia was not affecting his activities of daily living. (Ameji Affidavit and Affidavit of Carter, ¶ 15.)

Plaintiff's Immaterial Facts

1.    Terry Fueyo claims that there are strict guidelines and criteria which govern the decision making process in the Collegial Review. However, when answering Plaintiff's Second Request for Production of Documents, Wexford Health Sources stated that "[t]here are no documents detailing the Collegial Review process". (Pl.'s Second Req. for Prod., ¶Resp. 17). Defendants' RESPONSE: Undisputed and immaterial. Wexford Health Sources, Inc. physicians are made aware that a Collegial Review is available to them should they deem it necessary to make a clinical decision. The court finds that whether or not there are any documents detailing the Wexford's Collegial Review is immaterial as to whether the Defendants were deliberately indifferent to a serious medical need.
2.    In response to a grievance, Terry Fueyo admits that he participated in the Collegial Review process which was commenced to determine if Plaintiff's hernia required surgical repair. During the Collegial Review process Terry Fueyo participated in the decision to deny Plaintiff surgery for his hernia. (Griev. - Date of Review 12/18/07 - #7ND12 - 39, ¶Exh. 24.) Defendants' RESPONSE: Terry Fueyo was present at the Collegial Review. However, Terry Fueyo does not have the authority to participate in making the decision on the treatment of a patient. Further, the court takes judicial notice that Terry Fueyo, a nurse, cannot supersede a physician's decision to not recommend surgery.
3.    On August 5,2008 Plaintiff submitted a detailed institutional grievance explaining in graphic detail the inadequate medical examinations he received from Dr. Ameji in reference to his hernia and explaining that Plaintiff was not receiving the treatment Dr. Ameji prescribed for his hernia pain. (Grievance - Date Aug. 5, 2008, ¶Exh. 29 thru 40.)

---

[2]These facts are immaterial as to whether the Defendants were deliberately indifferent to a serious medical need because Dr. Ameji provided adequate, reasonable treatment for the plaintiff's non-enstrangulated hernia.

Whether the plaintiff filed a grievance is immaterial as to whether the Defendants' were deliberately indifferent to a serious medical need.

4.   The Grievance Officer at Danville Correctional Center refused to process the grievance Plaintiff submitted on August 5, 2008 through the normal channels and sent Plaintiff a Memorandum stating that "the issue had been previously addressed on 12/19/07, so there was no justification for further consideration of Plaintiff's grievance. (Memo. - Nov. 20, 2008, ¶Exh. 41).  Whether or not the Grievance refused to process the Plaintiff's August 5, 2008 grievance through normal channels is immaterial as to whether the Defendants' were deliberately indifferent to a serious medical need.

5.   The Department of Corrections was aware that Plaintiff was not receiving the treatment Dr. Ameji prescribed for Plaintiff's hernia pain as a result of his institutional grievance because the Illinois Department of Corrections assist in the monitoring of Wexford Health Sources physicians through the grievance process which makes the Illinois Department of Corrections aware of inmates' concerns. (Wexford's Ans. to Second Set of Interr., ¶Int. 2.)  Even if true, IDOC's knowledge is immaterial as whether Defendants were deliberately indifferent to a serious medical need.

6.   Terry Fueyo was personally involved in the decision to deny Plaintiff surgery to repair his hernia because Terry Fueyo was a participant in a process called the Collegial Review which was commenced to determine if Plaintiff would be sent to a specialist who would determine if Plaintiff's hernia required surgical repair. (Pl's Exhib. - Griev. - Date of Review 12/18/07 - 7ND12 - 39, ¶Exh. 24.)  See Plaintiff's Immaterial Fact number 2.

7.   At Shawnee Correctional Center the Health Care Unit personnel, physician Alfonso David and the physician's assistant Linda Runge have personally adopted the policy that Wexford Health Sources issued to its designated officials and Illinois Department of Corrections officials, which was used to determine if Plaintiff's hernia required surgical repair. (Deposition of Carter, ¶Exh. FF, ¶p. 13-14; Medical Pol. and Proc., ¶Exh. 5A & 6A; Griev. - Date 10/21/09, ¶Exh. 2A; Griev. - Date of Review 11/02/09, ¶Exh. 7A.)  As Dr. Ameji and Terry Fueyo did not treat the Plaintiff while he was at the Shawnee Correctional Center.  As Plaintiff's claim arises out of Danville Correctional Center, this fact is immaterial as to whether the Defendants were deliberately indifferent to a serious medical need while Plaintiff was incarcerated at Danville Correctional Center.  Further, the Medical Policy and Procedure provided by Plaintiff states that "[d]ecision regarding patient suitability for consideration of abdominal wall herniorrhaphy (hernia surgery) must be made on a case-by-case basis.  These recommendations are intended only as a guide for the site physician and are not intended to replace a hands-on clinical judgment.

Discussion and Conclusion

Plaintiff must prove deliberate indifference to a serious medical need.  At a minimum, this requires actual knowledge of impending harm which is easily preventable so that a conscious, capable refusal to prevent harm can be inferred from the Defendant's failure to prevent it.  *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997); *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985).  Deliberate indifference is more than mere negligence and approaches intentional wrongdoing.  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  To establish

deliberate indifference, Plaintiff must show the Defendant ignored a known risk. *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). Additionally, in order to establish deliberate indifference, Plaintiff must show that the physician or other Defendants must both have been aware of the fact from which the inference could be drawn that a substantial risk of serious harm exists, and he must actually draw the inference. *Higgins v. Correctional Medical Services*, 178 F.3d 508, 511 (7th Cir. 1999); Sanderfer v. Nichols, 62 F.3d 151, 154 (6th Cir. 1995). The exercise by a physician of his professional judgment does not constitute deliberate indifference. *Youngberg v. Romeo*, 457 U.S. 307, 322-323 (1982).

Medical decisions, such as whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview. Further, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). Inappropriate medical treatment based on pure negligence, or even a series of purely negligent acts, is not the same as indifference to a serious medical need. *Sellers v. Henman*, 41 F.3d 1100, 1102-03 (7th Cir. 1994). A prisoner has the right to medical care, however, he does not have the right to determine the type and scope of the medical care he personally desires. Further, a difference of opinion between a physician and the patient does not give rise to a constitutional right, nor does it state a cause of action under § 1983. *Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. Col. 1968). *See also Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006). Inattention to a medical condition amounts to a constitutional violation only where the medical condition is serious. *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991).

Again, deliberate indifference may only be found when an official knows of and disregards an excessive risk to inmate health or safety. *See Duane v. Lane*, 959 F.2d 673, 676 (7th Cir. 1992). Deliberate indifference also requires that Defendants either intended to harm Plaintiff or knew of a risk of harm so significant that an intent to harm could be inferred from a refusal to provide medical care. *See Smith-Bey v. Hospital Administrator*, 841 F.2d 751, 759 (7th Cir. 1988). Plaintiff's claim is one in which he is asserting that his Eighth Amendment right has been violated. The Eighth Amendment does not require that prisoners receive "unqualified access to healthcare." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *see also, Hernandez v. Keane*, 341 F.3d 137 (2d Cir. 2003). Rather, inmates are entitled only to "adequate medical care." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002). Specifically, the Eighth Amendment does not entitle an inmate to demand specific care.

Conclusion

Dr. Ameji's conservative treatment of the Plaintiff's left inguinal hernia was not deliberately indifferent. Plaintiff admits that his left inguinal hernia was never enstrangulated while he was incarcerated at the Danville Correctional Center. Further, Plaintiff admits that his hernia was reducible at all times. Under the deliberate indifference standard, the ability of the Plaintiff to perform the acts of daily living are considered in determining whether conservative treatment was appropriate. In this case, Plaintiff admits that he was able to bench press over 300 pounds while he was at the Danville Correctional Center. Further, Plaintiff admits that three to four times a week, he would participate in weightlifting while at the Danville Correctional

9

Center.   When Plaintiff continued to complain about his hernia bothering him (although plaintiff denies he was instructed) Dr. Ameji's medical notes indicate that he ordered the Plaintiff not to go to the gym or perform any straining exercises.  By the time Dr. Ameji and Terry Fueyo treated the Plaintiff for his inguinal hernia, he had been suffering with the hernia for over five years.  Dr. Ameji found the Plaintiff to be suffering from a small, left-sided inguinal hernia that was easily reducible at all times.  At the conclusion of all visits between the Plaintiff and Dr. Ameji, Plaintiff's hernia remained reducible and not in need of surgical intervention.  Further, Plaintiff was offered a hernia belt to help alleviate his complaints as to the hernia, which he refused to accept.  The Seventh Circuit has addressed this issue in *Johnson v. Doughty*, 433 F.3d 1001, (7th Cir. 2006.)  In *Johnson*, the Court found that a physician who evaluated an inmate on multiple occasions for a non-enstrangulated, non-emergent, reducible hernia was not deliberately indifferent in denying the Plaintiff's surgery.  Further, non-surgical remedies designed to alleviate the inmate's pain from the hernia are not a violation of the Eighth Amendment. *Johnson*, at 1014.  Here, as in *Johnson*, Dr. Ameji evaluated the Plaintiff and found the Plaintiff's hernia did not require surgery.  Each time Dr. Ameji evaluated the Plaintiff, the hernia was reducible and could be treated through non-surgical means.  At no time was Plaintiff's hernia enstrangulated while he was at the Danville Correctional Center.  In Dr. Ameji's professional opinion, surgery was not required to repair the Plaintiff's hernia.  The records show Dr. Ameji considered the Plaintiff's complaints and based his decision on his physical examination of the Plaintiff.  Further, the record in this case indicates Dr. Ameji's treatment of the Plaintiff was grounded in his professional judgment and the Plaintiff was afforded adequate, reasonable medical treatment.  Consequently, here, as in *Johnson*, summary judgment is appropriate.

Further, as Dr. Ameji provided adequate, reasonable medical treatment for the plaintiff's non-enstrangulated hernia, summary judgment is appropriate for Terry Fueyo also.  Furthermore, Terry Fueyo is entitled to summary judgment because his care was so minimal as to not trigger constitutional scrutiny and his care of the Plaintiff was appropriate.  Plaintiff has provided  no evidence as to Defendant Fueyo that would indicate a direct, personal involvement in any medical decisions, as required to sustain a claim against him under § 1983.  *See E.G. Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).  Plaintiff has also failed to provide evidence that the alleged violation of his constitutional rights occurred at Fueyo's direction or with his knowledge or consents.  *Id*. "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual Defendant causes or participates in a constitutional deprivation." *Vance v. Washington*, 97 F.3d 987, 991 (7th Cir. 1996) (citations omitted).  Plaintiff's only allegation is that Fueyo did not adequately respond to his grievance.  According to Mr. Fueyo, his only involvement in the Plaintiff's care was to witness the September 18, 2008  interaction between Dr. Ameji and the Plaintiff.  Based on these facts, Terry Fueyo did not have enough personal involvement in the treatment of the Plaintiff's hernia to indicate a constitutional violation.  Fueyo was involved in only one small aspect of the care of the Plaintiff's hernia.  There is no evidence to suggest Terry Fueyo's actions in this case were deliberately indifferent to the Plaintiff's serious medical needs.

Wexford Health Sources, Inc. is also entitled to summary judgment because Dr. Ameji provided adequate, reasonable medical treatment for the plaintiff's hernia.  Plaintiff has

failed to provide any evidence to show that his medical treatment was based on any Wexford Health Sources, Inc. policy or procedure.  The plaintiff's own exhibit shows that Wexford's position is that a decision regarding patient suitability for  consideration of hernia surgery must be made on a case-by-case basis and that Wexford's recommendations are intended only as a guide for the site physician and are not intended to replace a hands-on clinical judgment. Further, it is well established that Section 1983 does not give rise to causes of action based upon the doctrine of respondeat superior.  To be held liable for such a claim, a defendant must be personally responsible for the deprivation of constitutional right.  *See Sandville v. McCaughtery*, 266 F.3d 724, 740 (7th Circuit 2001).  It appears in Plaintiff's complaint that he is attempting to state a cause of action against a private corporation, Wexford Health Sources, Inc., for vicarious liability.  This is improper.  *See Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Circuit 1982).  In order to state a cause of action against a corporate Defendant, the Plaintiff must demonstrate that a constitutional deprivation occurred as a result of an expressed policy or custom.  *Jackson v. Illinois Medicare, Inc*., 300 F.3d 760 (7th Circuit 2002).  Plaintiff has not done so.

Dr. Ameji is also entitled to summary judgment as to Plaintiff's claims of medical battery.  Under Illinois law, a cause of action for battery may be established where there is a total lack of consent to a medical procedure.  Recovery under a battery theory in a medical malpractice case may be allowed where the treatment is either against the patient's will or substantially at variance with the consent given.  *See Gaskin v. Goldwasser*, 166 Ill. App. 3d 996, 250 N.E.2d 1085 at 1012, 1095 (4th Dist. 1998).  In evaluating a cause of action for battery under Illinois law, the scope of the patient's consent is crucial to the ultimate recovery in a battery action.  *Id*.  The doctor's privilege is limited at least to acts substantially similar to those to which the Plaintiff has already consented.  If the Defendant went beyond the consent given to perform substantially different acts, they may be liable.  The time, place and circumstances will affect the nature of the consent given.  *Mink v. University of Chicago*, 460 F. Supp. 713 (N. Dist. Ill. 1978).  If the patient has consented to the doctor's treatment, he may not later maintain an action in battery.  *Id*. at 718.  In evaluating a cause of action for battery under Illinois law, the scope of the patient's consent is crucial to the ultimate recovery in a battery action.  *Id.*

In this case, the Plaintiff admits that he gave consent to the medical procedure that was provided to him by Dr. Ameji.  The Plaintiff does not claim that Dr. Ameji varied from the consent that was given.  The Plaintiff only argues that once the procedure began, he claims to have changed his mind in the middle.  Counsel for the defendants, nor this court has found no law which would indicate that consent can be withdrawn in the middle of a procedure which would allow a cause of action to be brought against a physician for assault and/or battery after the procedure had begun.  In essence, the Plaintiff claims that he withdrew his consent midway through the procedure.  However, the Plaintiff admits that nearly simultaneously to the withdrawal of consent, Dr. Ameji withdrew his hands and never touched the Plaintiff again.  Dr. Ameji asserts that at no time was he made aware of the Plaintiff's dissatisfaction or changing consenting to this procedure. This is somewhat irrelevant and does not create a genuine issue of material fact. The fact remains that even if the Plaintiff changed his mind, the procedure had already begun and Dr. Ameji could not have stopped his examination any sooner than what he

11

did for the Plaintiff. Most important, there is no evidence that Plaintiff suffered any injury as a result of the actions of Dr. Ameji after the alleged withdrawal of consent. At most, he suffered a small amount of pain for a few moments or so. The court finds there is no reasonable trier of fact that could find in favor of the Plaintiff with respect to this claim. Accordingly, Defendant Ameji is entitled to judgment as a matter of law.

In their memorandum of law, Defendants advise the court that Plaintiff alleges that he is asserting a claim of retaliation against Dr. Ameji in regards to his gym and yard privileges. Defendants note, as well as this court, that Plaintiff has not stated any such retaliation claim in his Amended Complaint. As such, Defendants' objections to Plaintiff asserting any such claim in this matter at this point in the litigation is sustained. As the plaintiff did not raise a claim of retaliation in his complaint, he may not proceed on a claim of retaliation. Furthermore, the medical records clearly indicate that Dr. Ameji's orders that Plaintiff be placed on gym restriction were based on Plaintiff's complaints of pain. Simply put, if Dr. Ameji ordered the Plaintiff to avoid strenuous exercise, there would be no need for the Plaintiff to go to the gym where weightlifting occurs and basketball games occur. It appears that due to a clerical oversight, Plaintiff was denied yard access as well. Once this issue was brought to the attention of the Danville Correctional Center staff, it was quickly rectified. It is clear from the records that Dr. Ameji wanted the Plaintiff to be allowed to participate in yard activities, but not gym activities. Most important, Plaintiff admits in his deposition that he has no evidence to suggest that Dr. Ameji made these orders in retaliation for any protected constitutional right. *See* Plaintiff's deposition, p. 27. Based on Plaintiff's lack of evidence and the undisputed medical records, any retaliation claim Plaintiff may have made is unsubstantiated and Dr. Ameji would have been granted summary judgment.

Defendants are entitled to summary judgment on all claims made by the Plaintiff. There is no genuine issue of material fact as to the treatment provided to the Plaintiff by the Defendants. According to the undisputed medical records, Dr. Ameji provided appropriate treatment to address Plaintiff's complaints. As to Plaintiff's battery claim, accepting Plaintiff's version, it is undisputed that Dr. Ameji terminated his examination of the plaintiff as soon as consent was revoked. Likewise, Terry Fueyo was not personally involved in the treatment decisions. Therefore, he cannot be held liable even if the Plaintiff had suffered deliberate indifference. Finally, Dr. Ameji's undisputed testimony verifies that his treatment decisions were based on his medical judgment, training, and experience and not a Wexford policy. Therefore, Wexford Health Sources, Inc. is entitled to summary judgment.

It is ordered:

1.    The defendants' motion for summary judgment [84] is granted. The Clerk of the court is directed to enter judgment in favor of all the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56. The case is terminated. The parties are to bear their own costs.

3.    If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present

on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.

Enter this 7th     day of September 2011.


/s/ Michael P. McCuskey
_____
Michael P. McCuskey
Chief United States District Judge